1   ANDRÉ BIROTTE JR.
    United States Attorney
2   ROBERT E. DUGDALE
    Assistant United States Attorney
3   Chief, Criminal Division
    STEVEN R. WELK
4   Assistant United States Attorney
    Chief, Asset Forfeiture Section
5   KATHARINE SCHONBACHLER
    Assistant United States Attorney
6   Asset Forfeiture Section
7   California Bar No. 222875
        Federal Courthouse, 14th Floor
8       312 North Spring Street
        Los Angeles, California 90012
9       Telephone: (213) 894-3172
        Facsimile: (213) 894-7177
10      E-mail: Katie.Schonbachler@usdoj.gov

11  Attorneys for Plaintiff
    UNITED STATES OF AMERICA
12

13              UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15  UNITED STATES OF AMERICA,        CV 13-8686 CAS (ASx)

16              Plaintiff,

17              v.                   VERIFIED COMPLAINT FOR FORFEITURE

18  ONE REAL PROPERTY LOCATED IN     [18 U.S.C. §§ 981(a)(1)(A) and
    MALIBU, CALIFORNIA,              (C)]
19
                                     [F.B.I.]
20              Defendant.

21      The United States of America brings this claim against the

22  defendant One Real Property located in Malibu, California (the

23  "Malibu property") and alleges as follows:

24                  JURISDICTION AND VENUE

25      1.  This is a civil forfeiture action brought pursuant to

26  18 U.S.C. § 981(a)(1)(A) and (C).

27      2.  This court has jurisdiction over the matter under 28 U.S.C.

28  §§ 1345 and 1355.

                            1

3.     Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

### PERSONS AND ENTITIES

4.    The plaintiff is the United States of America.

5.    The defendant is One Real Property located in Malibu, California (the "Malibu property").[1]  The Assessor's Parcel Number for defendant Malibu property is 4467-005-020.  A legal description of the property is attached hereto as Exhibit A.  As of June 16, 2008, title to the property is in the name of Charles Ficeto as trustee of Western Promethean Grantor Retained Income Trust ("Western Promethean Trust").[2]

6.    The interests of Todd M. Ficeto ("Ficeto"), Charles Ficeto, Western Promethean Trust and J.P. Morgan Chase may be adversely affected by these proceedings.

### EVIDENCE SUPPORTING FORFEITURE

7.    The defendant Malibu property was purchased with proceeds from an international securities fraud scheme that involved the manipulation of billions of shares in United States "penny stock"[3] companies through a Beverly Hills-based broker-dealer, Hunter World Markets, Inc. ("Hunter World"), which was co-owned by Ficeto and Florian Homm ("Homm").  Homm, Ficeto, and other co-conspirators

---

[1] Pursuant to Local Rule 5.2-1, home addresses have been omitted from this Complaint.

[2] On September 19, 2006, the property was purchased by Todd M. Ficeto.  On June 16, 2008, Todd M. Ficeto transferred title of the property to Charles Ficeto as trustee of Western Promethean Trust.

[3] The term "penny stock" generally refers to low-priced (below $5 and often below $1) securities of very small companies that typically trade on an over-the-counter quotation service (rather than a national stock exchange), but could also trade on foreign securities exchanges.

caused certain hedge funds managed by Homm (the "Absolute Funds") to invest in the penny stocks, and then, by trading the stocks among the Absolute Funds, fraudulently inflated and/or propped up the stock prices to exaggerate the purported profitability of the funds. This enabled the conspirators, including Ficeto, Homm, and their entity, Hunter World, to sell their own shares of the penny stocks to the Absolute Funds at the inflated prices. The stock price inflation also served to fraudulently overstate the performance of the Absolute Funds which, in turn, generated substantial performance fees and other compensation for Homm. As a result of the fraud, the Absolute Funds lost at least $200 million.

8. As described in detail below, Ficeto and Hunter World received millions of dollars in profits from fraudulent transactions related to the penny stock companies. Profits from self-dealing transactions in shares of the penny stocks were primarily cleared through accounts that Ficeto controlled at RBC Dain Rauscher ("RBC"), a Minneapolis, Minnesota-based company that specialized in clearing, custody and execution services. Ficeto controlled several accounts at RBC including, but not limited to accounts held in his name, Hunter World, as well as two accounts held in the names of his minor children, for which he was custodian. Ficeto and Hunter World also received fraud proceeds from accounts managed by Wells Fargo Corporate Trust ("WF Trust") and Troy Gould. The payments from WF Trust and Troy Gould, a law firm that acted as transactional counsel for the various private placements, represented fees for Hunter World's role as placement agent for the penny stock companies.

9. Ficeto would then cause the fraud proceeds that he received to be transferred to other accounts under his control at financial

institutions in the United States.  He would then effect further
transfers to the other accounts he controlled in the United States
and the Cook Islands. The tracing of the proceeds used to purchase
the defendant Malibu property is outlined in Exhibits B and C and in
paragraphs 41-48 below.

10.  At all times relevant to this Complaint, the individuals
and entities involved in the fraud scheme included:

a.  Todd M. Ficeto:  Ficeto, a United States citizen and
resident of Malibu, California and Columbus, Ohio, was a registered
securities representative and President and Director of Hunter World,
in which he held a 50 percent interest.  Ficeto founded Hunter World
in or about March 2004.  Homm and Ficeto each held a 50 percent co-
ownership interest in Hunter World, but Ficeto managed all of Hunter
World's business.  According to filings of the Securities & Exchange
Commission ("SEC"), Ficeto was under heightened regulatory
supervision from November 2004 until June 2006.  He has a history of
regulatory discipline, and was censured and fined by the National
Association of Securities Dealers ("NASD") in 1996, 2002, and 2004.
Ficeto made approximately $27.3 million as a result of the fraudulent
scheme, including stock sales, sales credits, commissions and other
fees.

b.  Florian Jürgen Homm:  Homm, a German national and
resident of Palma de Mallorca, Spain, was a co-founder, Director, and
Chief Investment Officer ("CIO") of Absolute Capital Management
Holdings Limited ("ACMH"), a hedge fund management company, and a 50
percent owner of Hunter World.  As CIO of ACMH, Homm held powers of
attorney that enabled him to invest on behalf of the Absolute Funds.
In this position, Homm had primary control over the investment

4

decisions of the Absolute Funds.  Through CSI Asset Management Establishment ("CSI"), a Liechtenstein investment vehicle that Homm controlled, Homm also held more than 50 percent of the outstanding shares of the management company ACMH.  Homm summarily resigned from ACMH and fled Palma de Mallorca on September 18, 2007. On or about March 19, 2013, Homm was indicted in the Central District of California (United States v. Homm, CR Misc. No. 13-0183) for violations of 18 U.S.C. § 1349 (conspiracy to commit securities fraud); 18 U.S.C. § 1348 (securities fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 2 (aiding and abetting and causing an act to be done).  Homm was arrested in Italy in March 2013, and the United States is currently seeking his extradition.

> c.  Colin Heatherington ("Heatherington"):  Heatherington, a Canadian national, was the head trader at ACMH in Palma de Mallorca, Spain, and worked closely with Homm.  Heatherington was involved on a daily basis in trading for the Absolute Funds, and was in regular contact with Hunter World and Ficeto.  Heatherington also co-owned and controlled CIC Global Capital Limited ("CIC Global"), a British Virgin Islands entity, along with his brother Craig Heatherington, who also was an ACMH employee.  As described below, Heatherington and his brother used CIC Global as a means to steal money from the Absolute Funds and to launder proceeds of the fraudulent scheme.  On or about October 8, 2013, a criminal complaint was issued against Heatherington in the Central District of California (United States v. Heatherington, CR Misc. No. 13-2726) for violations of 18 U.S.C. § 1349 (conspiracy to commit securities fraud); 18 U.S.C. § 1348 (securities fraud); and 18 U.S.C. § 1343 (wire fraud).

d. <u>Absolute Capital Management Holdings Limited</u>:  ACMH was a Cayman-Islands incorporated entity with offices in London, United Kingdom; Zug, Switzerland; Palma de Mallorca, Spain; and Grand Cayman, Cayman Islands.  ACMH was the investment manager for the eight Cayman Islands-based Absolute Funds:  Absolute East West Master Fund Limited ("East West Fund"); Absolute Activist Value Master Fund Limited ("Activist Value Fund"); Absolute Large Cap Master Fund Limited ("Large Cap Fund"); Absolute European Catalyst Fund Limited ("European Catalyst Fund"); Absolute Germany Fund Limited ("Germany Fund"); Absolute India Fund Limited ("India Fund") ; Absolute Octane Master Fund Limited ("Octane Fund"); and Absolute Return Europe Fund Limited ("Return Europe Fund").  The Absolute Funds purportedly had $2.1 billion in assets under management as of August 31, 2007.  ACMH was paid management and performance fees based on the performance of each Absolute Fund, calculated as a percentage of each respective Fund's Net Asset Value ("NAV").

e. <u>Hunter World Markets, Inc.</u>:  Hunter World was a California corporation based in Beverly Hills, California.  Hunter World was a registered broker-dealer with the Financial Industry Regulatory Authority, Inc. ("FINRA"), and made a market in various United States-based penny stocks.  Hunter World cleared its trades through its clearing broker, RBC.  Through RBC, Hunter World held brokerage accounts for its retail and institutional clients, as well as for the perpetrators of the fraud, in their own names and in the names of nominees.  Hunter World also offered investment banking services, to assist small companies in obtaining capital through private offerings of stock and debt and assisting them to make their stock tradable on public markets.  Hunter World made approximately

1   $32.5 million as a result of the fraudulent scheme, which was
2   allocated equally to Ficeto and Homm as a result of their co-
3   ownership of Hunter World.

4          f.   The Hunter Fund, Ltd.:  The Hunter Fund, Ltd. ("Hunter
5   Fund") was a hedge fund incorporated by Ficeto in the British Virgin
6   Islands in 2002, whose only investors were three of the Absolute
7   Funds.  Ficeto was the President and Chief Executive Officer of the
8   Hunter Fund and, through Hunter Advisors, LLC, a California limited
9   liability company that he managed and controlled, its Portfolio
10  Manager.  As described below, Ficeto and Homm used the Hunter Fund as
11  a vehicle to extract additional funds from the Absolute Funds to
12  invest into the penny stocks and manipulate the market for the penny
13  stocks.  Ficeto directed securities trades by the Hunter Fund through
14  its brokerage account at Hunter World.

15         11.  From in or about September 2003 through September 2007, the
16  fraud scheme operated generally as follows:

17         a.   Homm and co-conspirators at ACMH would induce
18  investors, including both natural persons and entities, to invest in
19  the Absolute Funds through investor solicitations.  Such
20  solicitations would include in-person presentations and meetings,
21  often including Homm, and would include the use of sales and
22  marketing literature describing: (1) the investment strategy of each
23  of the Absolute Funds; (2) the purported research, analysis, and
24  decision making process used by defendant Homm and ACMH in selecting
25  investments; (3) historical positive results for the respective
26  Absolute Funds; and (4) defendant Homm's personal history,
27  experience, and success as a hedge fund manager.

28

b.    Ficeto would identify small companies that had free-trading penny stock, or that could be reverse merged into public shell entities with free-trading penny stock.  Through Hunter World, Ficeto would offer to assist the penny stock companies in finding equity financing through a private offering, and Hunter World would enter into agreements with the penny stock companies to facilitate the private offerings.  At times, before the private offerings, Ficeto would personally obtain, or cause Hunter World to obtain, large blocks of stock or warrants to purchase additional shares at nominal prices.  As set forth below, after inflating the prices of the penny stocks, Homm and Ficeto would sell these shares to the Absolute Funds at inflated prices.

c.    In connection with the private offerings, Ficeto would at times cause Hunter World or the Hunter Fund to provide temporary or "bridge" financing to a penny stock company, secured through a promissory note issued to Hunter World or the Hunter Fund that required the penny stock company receiving the loan to pay a loan fee, and often would permit loan repayment with cash or stock in the company.

d.    Homm and Ficeto then would cause the Absolute Funds to make substantial investments in these penny stock companies by purchasing millions or even billions of shares in private placements. Homm would sign the subscription agreements on behalf of the Absolute Funds, along with Registration Rights Agreements that required the penny stock companies to promptly register the shares so they would be freely tradable.  Ficeto and Homm, through Hunter World, also would obtain agreements from existing shareholders of the penny stock

1 companies to abstain from selling their shares for a certain period
2 of time, often called "lock-up agreements."

3       e.   As Hunter World's compensation for the transactions,
4 Ficeto and Homm would cause shares and/or warrants to be allocated to
5 Hunter World, Ficeto, Heatherington, Hunter Fund, and their nominees,
6 including CIC Global Capital and Ficeto's minor children.  As set
7 forth below, after inflating the prices of the penny stocks, Homm,
8 Ficeto, and Heatherington would sell these shares to the Absolute
9 Funds at the inflated prices.

10       f.   Between in or about December 2004 and in or about July
11 2007, Homm, together with co-conspirators Ficeto and Heatherington,
12 caused European Catalyst Fund, Return Europe Fund, and Octane Fund to
13 invest over $34.6 million in the Hunter Fund.  The Hunter Fund
14 charged each of the Absolute Funds that held its shares a two percent
15 monthly management fee and a five percent monthly performance fee.
16 Homm and Ficeto then caused the Hunter Fund to invest millions of
17 dollars received from the Absolute Funds into certain of the penny
18 stock companies.  The investments in and by the Hunter Fund served to
19 conceal from the public the full extent of ownership of the penny
20 stock companies by the Absolute Funds.

21       g.   After the shares of the penny stock companies became
22 freely tradeable, Homm, Ficeto and Heatherington would engage in a
23 variety of trading techniques designed to manipulate the share
24 prices, principally through brokerage accounts of the Absolute Funds
25 maintained at Hunter World.  Through Hunter World, Homm, Ficeto and
26 Heatherington would cause the penny stock shares to be traded between
27 the Absolute Funds, or between themselves and the Absolute Funds, in
28 order to drive up the penny stock prices.  The market manipulation

1  scheme executed through Hunter World used a number of classic

2  manipulative techniques, including: (1) executing matched orders

3  ("cross-trades") between accounts at Hunter World for the Absolute

4  Funds, as well as between accounts held or controlled by Ficeto and

5  Heatherington; and (2) marking the close of the day or the month by

6  executing trades of the penny stocks among the Absolute Funds at or

7  near the close of the trading day in order to set the month or day-

8  end price.

9          h.    Homm caused the manipulative trades to be placed by

10  Heatherington, ACMH's primary trader, who sent hundreds of instant

11  messages ("IMs") between ACMH, in Palma de Mallorca, Spain, to Hunter

12  World's principal trader ("Hunter World Trader"), in Beverly Hills,

13  California, over a secret, alternate messaging system.[4]  The secret

14  IM system enabled the conspirators to communicate without fear that

15  the market manipulation would be discovered by regulators, victim

16  investors, and ACMH employees and executives who were non-

17  participants in the conspiracy.  As reflected in the secret IMs,

18  ACMH's trader, generally Heatherington but at times Heatherington's

19  brother, Craig Heatherington, instructed the Hunter World Trader,

20  acting under the direction and with the knowledge and consent of

21  Ficeto -- or at times Ficeto himself -- to place matched orders,

22  engage in transactions that marked the close, and engage in other

23  manipulative trading techniques for the purpose of artificially

24  raising or propping up the share prices of the penny stock companies.

25  _____

26      [4] The use of this secret messaging system was a violation of SEC
    regulatory rules, which required Hunter World to use the Bloomberg
27  instant messaging system, which IMs would be maintained in the
    Bloomberg system and available for review by Hunter World's
28  compliance officer and regulators.

i.   For example, it was the general pattern that, on or near the morning of the last day of the trading month, Heatherington would send a secret IM to the Hunter World Trader with a list of prices to set for various stocks by the end of the day.  The Hunter World Trader then would make trades as necessary to set these prices, at times with Heatherington making purchases on behalf of ACMH through other brokers.  Heatherington would direct the Hunter World Trader as to which of the Absolute Funds' accounts the trade should be recorded.  Ficeto would often be consulted regarding the trading.

12.   The stock manipulation scheme benefitted Homm, Heatherington and Ficeto by diverting monies from the Absolute Funds to the co-conspirators through (1) sales of the penny stocks from the co-conspirators to the Absolute Funds at inflated prices; and (2) commission, placement and transaction fees charged by Hunter World, in which Ficeto and Homm held a 50 percent interest.

13.   The stock manipulation scheme also benefitted Homm and his co-conspirators at ACMH by materially impacting the Absolute Funds' performance and NAVs, which were calculated at the end of the month, in a practice known as "portfolio pumping."  The manipulation also generated inflated performance and management fees -- forms of compensation that were determined by the reported performance of the Absolute Funds -- for ACMH as investment manager for the Absolute Funds (and derivatively for Homm and his co-conspirators at ACMH). Finally, increasing the prices of the stock of ACMH, in which Homm held a majority interest, permitted him to sell his stock at inflated prices.

14.   Examples of the fraudulent scheme involving two of the penny stock companies (ProElite, Inc. and MicroMed Cardiovascular,

1    Inc.) are described below.[5]

2                               ProElite, Inc.

3        15.   ProElite, Inc. ("ProElite") was a company based in Los

4    Angeles, California, that sponsored live and online mixed martial

5    arts events. The fraudulent scheme involving ProElite began in or

6    about September 2006, and eventually included a reverse merger

7    arranged by the conspirators through Hunter World.

8        16.   Between in or about September 2006 and in or about

9    September 2007, the conspirators caused the Absolute Funds to invest

10   approximately $35 million in private offerings of ProElite shares,

11   and tens of millions in market purchases, to manipulate the price of

12   ProElite shares for their own enrichment.  ProElite reported little

13   revenue from its operations and no profits during the time period.

14       17.   In or about September 2006, the conspirators caused five of

15   the Absolute Funds to spend approximately $10 million to purchase

16   more than 4 billion shares of ProElite and more than 3 million

17   warrants exercisable at $0.004 per share.  Homm personally signed the

18   Securities Purchase and Registration Rights agreements.

19       18.   At or about the same time, as part of a repayment of a loan

20   provided to ProElite by the Hunter Fund, Ficeto caused ProElite to

21   issue additional shares to Hunter World, to the minor children of

22   Ficeto, and to Heatherington's entity, CIC Global Capital. As set

23   forth below, those shares were later sold to some of the Absolute

24   Funds at inflated prices.

25

26   ─────────────────

27        [5] Some of the other penny stock companies included:
     Cyberkinetics Neurotechnology Systems, Inc.; Berman Center, Inc.;
     Duravest, Inc.; Intermetro Communications, Inc.; Java Detour, Inc.;
28   Logistical Support, Inc.; and Quest Group International, Inc.

19.   After the reverse merger of ProElite in or about October 2006, its stock traded at about $0.10 per share on the Pink Sheets, an over-the-counter quotation service.   Soon thereafter, the conspirators caused the Absolute Funds to begin cross-trading shares of ProElite amongst the Absolute Funds through Hunter World.

20.   In or about January 2007, ProElite filed a registration statement with the SEC relating to the shares obtained by the Absolute Funds in or about September 2006, which statement was later amended to register the additional shares received by Hunter World, Heatherington, and Ficeto's minor children.

21.   On or about May 15, 2007, the day after the registration statement became effective and the ProElite shares became publicly tradable, Heatherington, using the secret IM system referenced above, instructed a Hunter World Trader to send confirmations of the day's trades only to him.

22.   After the close of trading on or about May 15, 2007, at the direction of Heatherington, Hunter World began executing a series of matched orders among the Absolute Funds, causing the stock price to rise from $3.20 to $7.99, and then to $12.99, all within a span of minutes.   Once the stock price reached its peak, Hunter World, Ficeto, and Heatherington all sold portions of their ProElite stock holdings to the Absolute Funds at those artificially inflated prices, as set forth below:

///
///
///
///
///

| Trade Date | RBC Account Name | Buy or Sell | Execution Time | Hunter World Reported Volume | Price | Total Proceeds |
|---|---|---|---|---|---|---|
| 5/15/07 | Activist Value Fund | S | 16:36 | (500,000) | $3.20 | $1,600,000 |
| 5/15/07 | Octane Fund | B | 16:36 | 500,000 | $3.30 | $1,650,000 |
| 5/15/07 | Large Cap Fund | S | 16:36 | (600,000) | $3.20 | $1,920,000 |
| 5/15/07 | East West Fund | B | 16:36 | 600,000 | $3.30 | $1,980,000 |
| 5/15/07 | European Catalyst Fund | S | 16:36 | (3,000,000) | $3.20 | $9,600,000 |
| 5/15/07 | Return Europe Fund | B | 16:36 | 3,000,000 | $3.30 | $9,900,000 |
| 5/15/07 | CIC Global | S | 16:38 | (140,000) | $7.99 | $1,118,600 |
| 5/15/07 | Hunter World | S | 16:38 | (800,000) | $7.99 | $6,392,000 |
| 5/15/07 | Return Europe Fund | B | 16:38 | 940,000 | $8.05 | $7,567,000 |
| 5/15/07 | Ficeto as Custodian for his minor daughter | S | 16:40 | (5,000) | $11.99 | $59,950 |
| 5/15/07 | Ficeto as Custodian for his minor son | S | 16:40 | (5,000) | $11.99 | $59,950 |
| 5/15/07 | Return Europe Fund | B | 16:40 | 10,000 | $12.05 | $120,500 |

The manipulative trading caused the Absolute Funds that invested in ProElite to report fraudulent unrealized gains on the investments of over 250% for the month ending May 2007.

    23.  From on or about May 31, 2007 through on or about August 30, 2007, the conspirators continued to manipulate the price of ProElite stock by causing the Hunter World Trader to execute trades on the last day of the month to set the closing price for the day and month.  The conspirators continued to profit from the manipulation by

14

1  causing the Absolute Funds to purchase additional shares of ProElite
2  from Hunter World, Ficeto, and CIC Capital from in or about June 2007
3  through in or about September 7, 2007.

4       24.  During this period, and as further set forth below, the
5  conspirators also laundered proceeds of the fraud by causing proceeds
6  to be transferred from their Hunter World brokerage accounts,
7  maintained by RBC, to their personal accounts at other financial
8  institutions.

9       25.  After Homm's resignation from ACMH on or about September
10 18, 2007, the conspirators were no longer able to prop up the share
11 price of ProElite, which began trending downward on thin volume.

12      26.  From in or about September 2006 through in or about
13 September 2007, Hunter World obtained approximately $14.2 million by
14 selling shares of ProElite to the Absolute Funds, approximately $2.8
15 million from sales of ProElite shares to the Hunter Fund, and
16 approximately $1.1 million in commissions from executing trades of
17 ProElite.

18                    <u>MicroMed Cardiovascular, Inc.</u>

19      27.  MicroMed Cardiovascular, Inc. ("MicroMed"), a company based
20 in Houston, Texas, developed and sought to sell a miniaturized heart
21 pump.  The fraudulent scheme involving MicroMed began in or about
22 August 2005, following a reverse merger arranged by the conspirators
23 through Hunter World.

24      28.  Between in or about August 2005 and through in or about
25 September 2007, defendant Homm and his co-conspirators caused the
26 Absolute Funds to invest more than $26 million in approximately 24
27 million shares of MicroMed stock, and manipulated its price for their
28 own enrichment.  During this period and shortly thereafter, MicroMed

1  reported in its SEC filings net losses for 2005 and 2006, and over $6
2  million in losses for the 9 months ending September 30, 2007.

3       29.  Starting in or about August 2005, the conspirators caused
4  six Absolute Funds to purchase almost 19 million shares of MicroMed
5  stock in three private placements at prices between $0.72 and $1.55
6  per share.  Hunter World obtained commissions of more than $2 million
7  on these private placements, as well as 300,000 shares of MicroMed
8  stock and warrants to purchase more than 4 million shares of MicroMed
9  stock.

10      30.  From December 2005 to March 2007, Ficeto was also a
11 director of MicroMed Cardiovascular, Inc.

12      31.  As a condition of a June 2006 private offering, Hunter
13 World secured agreements from most of the MicroMed shareholders to
14 lock them out of trading of MicroMed shares until in or about April
15 1, 2007.  Hunter World and the Absolute Funds were not locked out of
16 such trading.

17      32.  After locking out most of the MicroMed shareholders
18 from trading (from in or about June 2006 through at least in or about
19 October 2006), the conspirators caused the Absolute Funds to trade
20 MicroMed shares privately between and amongst themselves, either at
21 $0.00 or at below-market prices, while at the same time buying or
22 selling shares through Hunter World in order to set the stock price.

23      33.  From in or about June 2006 through in or about March
24 2007, generally through the secret IM system, Heatherington would
25 direct Ficeto and the Hunter World Trader to make market trades using
26 the Absolute Funds' accounts to set the closing price of MicroMed
27 stock for the day or the month.  Thus, the conspirators were able to
28

1 support the price of MicroMed near $4.00 per share until March 30,
2 2007.

3     34.   Starting in or about April 1, 2007, after the lock-up
4 agreements expired, the conspirators were no longer able to prop-up
5 the price of MicroMed, which began an inexorable slide.  By in or
6 about April 23, 2007, the price had dropped as low as $0.32 per
7 share.  The conspirators nevertheless continued to trade MicroMed
8 shares amongst the Funds to set the closing price and reduce losses.

9     35.   From in or about September 2005 through in or about
10 September 2007, Hunter World obtained approximately $8 million by
11 selling its own shares of MicroMed to the Absolute Funds, and
12 $323,298 in commissions from executing trades of MicroMed stock.

The Scheme Collapses

14     36.   In or about June 2007, Homm, through his entity CSI, sold
15 over 2 million of his shares in ACMH for over €15 million.

16     37.   In the summer of 2007, the Absolute Funds' prime brokers,
17 Morgan Stanley & Co. and Deutsche Bank, executed calls to reduce the
18 Absolute Funds' margins -- that is, the amount of monies that could
19 be borrowed by the Absolute Funds from the prime brokers relative to
20 the value of the cash and stock held in the Absolute Funds' accounts.
21 The Absolute Funds were forced to liquidate certain assets, which
22 raised awareness within ACMH as to the illiquid nature of the penny
23 stock assets.

24     38.   In or about August 2007, Homm approached the Board of
25 Directors of ACMH and offered to prop-up the Absolute Funds'
26 performance by giving 5 million of his ACMH shares, held through CSI,
27 to Activist Fund, European Catalyst Fund, and Octane Fund in order to
28 increase these Absolute Funds' liquidity and offset losses.  The

17

1  Directors agreed to accept the shares, but only if the gift was
2  disclosed pursuant to London Stock Exchange rules and included in the
3  Absolute Funds' investor newsletters, which generally were
4  disseminated in or about the middle of the following month.

5      39.  On or about September 18, 2007, before the disclosure of
6  the Homm gift, Homm was scheduled to meet with ACMH's new chief
7  executive in Palma de Mallorca, Spain, to discuss the increased
8  oversight of Homm's investment decisions and bonus payments.
9  Instead, Homm abruptly resigned and fled, purportedly with $1.2
10  million in cash hidden in the clothing and belongings of Homm and his
11  traveling companion.

12      40.  Thereafter, a number of legal actions were initiated
13  against Homm, Ficeto, Hunter World and others, including a complaint
14  filed by the SEC in the Central District of California on or about
15  February 24, 2011, entitled <u>SEC v. Ficeto et al.</u>, CV 11-1637-GHK,
16  alleging civil securities fraud and related charges against Ficeto,
17  Homm, Heatherington, Hunter World and Hunter Advisors, LLC.  The SEC
18  case is currently stayed.

19  <u>Tracing of Fraud Proceeds to the Purchase of the Defendant</u>
20  <u>Malibu Property</u>

21      41.  Based on statements made by Ficeto in the course of sworn
22  testimony related to the Absolute Funds, U.S. securities industry
23  regulatory records, and bank records, Plaintiff alleges that Ficeto's
24  principal source of income from approximately September 2004 through
25  approximately February 2008 was fraud proceeds from Hunter World and
26  Hunter Advisors.

27      42.  In or about January 2008, in response to a regulatory
28  inquiry from FINRA, counsel for Hunter World and Ficeto represented

the following regarding Ficeto's interest in and compensation from Hunter World:

      a.   Ficeto was co-owner, President, and Chief Executive Officer of Hunter World;

      b.   Ficeto's compensation was derived from the profits of Hunter World;

      c.   Ficeto made no capital contributions to Hunter World during the "Relevant Time Period" (this time period was not defined in the letter from Ficeto's counsel, but the question from FINRA asked about any and all capital contributions); and

      d.   Ficeto possessed a 50 percent ownership interest in Hunter World.  Ficeto said the then-current value of his interest in Hunter World was approximately $4.9 million.

    43.  As described above and reflected in Exhibits B and C, Ficeto and Hunter World received millions of dollars in proceeds from fraudulent transactions related to the penny stock companies.  The wire transfers of fraud proceeds illustrated on Exhibits B and C are outlined to show the tracing of the funds used to make the down payment of approximately $5.3 million on the defendant Malibu property.  These Exhibits do not reflect all of the wire transfers of fraud proceeds that Ficeto received as a result of the scheme.

    44.  On or about September 19, 2006, Ficeto purchased the Malibu property for $8,400,000.  Ficeto paid a total down payment of $5,361,600.00 and financed the remaining $3,000,000 due through a mortgage loan obtained from Washington Mutual Bank (now J.P. Morgan Chase).  The tracing of the fraudulent proceeds applied to the down payment and mortgage payments is outlined in Exhibits B and C.

45.  The down payment of $5,361,600.00 consisted of the following three payments:

a.  On or about July 24, 2006, a check in the amount of $100,000 payable to Coldwell Banker was drawn from Ficeto's Union Bank of California account ending in 5962 ("UBOC 5962").

b.  On or about August 4, 2006, a check in the amount of $152,000 payable to Heritage Escrow was drawn from UBOC x5962.

c.  On or about August 3, 2006, $5,139,600 was wire transferred from Ficeto's Union Bank of California account ending in 5970 to The Heritage Escrow Company.

46.  Between November 7, 2006 and February 10, 2013, approximately seventy-three payments were paid to Washington Mutual/JP Morgan Chase ("Chase mortgage") which were credited to the mortgage loan that Ficeto owed on the defendant Malibu property totaling approximately $930,774.24.

47.  Plaintiff alleges that Ficeto transferred title to the defendant Malibu property in an attempt to conceal the asset from law enforcement.  Ficeto had been interviewed by FINRA in January 2008 about his business and finances.  Then in or about June 2008, Ficeto transferred title to the defendant Malibu property out of his name and into the name of Western Promethean Grantor Retained Income with his father listed as Trustee.  Later that same year (in approximately August 2008), Ficeto opened accounts at Australia and New Zealand Banking Group, Ltd. ("ANZ accounts") in the Cook Islands in the name of a trust with his father Charles Ficeto as the signatory trustee and Ficeto transferred approximately $10 million of fraud proceeds to these offshore ANZ accounts.  Ficeto later transferred at least $700,000 of the fraud proceeds in the ANZ accounts to JPMorgan Chase

1  account ending in 1441 held in the name of Western Promethean Grantor

2  Retained Income Trust ("Western Promethean Chase 1441").

3      48.  From approximately October 20, 2008 to February 10, 2013,

4  approximately $746,067 (of a total of $930,774.24) in mortgage

5  payments were drawn from Western Promethean Chase 1441.  Charles

6  Ficeto is the only signatory on Western Promethean Chase 1441.

7  Charles Ficeto is a senior citizen who has resided in the same

8  residence in New York for over 40 years, and does not appear to have

9  the financial means to be able to afford to pay the large monthly

10  mortgage payments from his own income.

11  FIRST CLAIM FOR RELIEF

12      49.  Plaintiff alleges that the defendant Malibu property is

13  subject to forfeiture to the United States pursuant to 18 U.S.C. §

14  981(a)(1) (C) because it was purchased with proceeds traceable to one

15  or more violations of 18 U.S.C. § 1349 (conspiracy to commit

16  securities fraud); 18 U.S.C. § 1348 (securities fraud); and 18 U.S.C.

17  § 1343 (wire fraud).  These violations constitute "specified unlawful

18  activity" pursuant to 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(B)(wire

19  fraud) and 1961(1)(D)(offenses involving fraud in the sale of

20  securities, punishable under any United States law).

21  SECOND CLAIM FOR RELIEF

22      50.  Plaintiff further alleges that the defendant Malibu

23  property is subject to forfeiture to the United States pursuant to 18

24  U.S.C. § 981(a)(1)(A) because it was involved in one or more

25  violations of 18 U.S.C. §§ 1956 (money laundering) and 1957

26  (transactions in criminally-derived proceeds).

27      WHEREFORE, plaintiff United States of America prays that:

28      (a)  due process issue to enforce the forfeiture of the

1  defendant Malibu property;

2      (b)   due notice be given to all interested parties to appear and
3  show cause why forfeiture should not be decreed;

4      (c)   that this Court decree forfeiture of the defendant Malibu
5  property to the United States of America for disposition according to
6  law; and

7      (d)   for such other and further relief as this Court may deem
8  just and proper, together with the costs and disbursements of this
9  action.

10  DATED: November 25, 2013            ANDRÉ BIROTTE JR.
                                        United States Attorney
11                                      ROBERT E. DUGDALE
12                                      Assistant United States Attorney
                                        Chief, Criminal Division
13                                      STEVEN R. WELK
                                        Assistant United States Attorney
14                                      Chief, Asset Forfeiture Section

15

16                                      _____
                                        KATHARINE SCHONBACHLER
17                                      Assistant United States Attorney

18                                      Attorneys for Plaintiff
                                        United States of America

19

20

21

22

23

24

25

26

27

28

<u>VERIFICATION</u>

I, Elliot M. Manegold, hereby declare that:

1.    I am a Special Agent with the Federal Bureau of Investigation and am the case agent for the forfeiture matter entitled <u>United States of America v. One Real Property in Malibu, California</u>.

2.    I have read the above Verified Complaint for Forfeiture and know its contents.  It is based upon my own personal knowledge and reports provided to me by other law enforcement personnel.

3.    Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed November 25, 2013 in Los Angeles, California.

ELLIOT M. MANEGOLD

<u>EXHIBIT A</u>

PARCEL 1:

A PARCEL OF LAND BEING A PORTION OF THE RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGE 407 ET SEQ., OF PATENTS, IN THE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, IN THE OFFICE OF THE COUNTRY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST NORTHERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO GLENN I. VOORHEIS AND WIFE, FILED FOR RECORD JANUARY 19, 1945 AS INSTRUMENT NO. 913, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 4° 42' 10" EAST 70 FEET; THENCE SOUTH 76° 30' 37" WEST 869.13 FEET, MORE OR LESS TO THE NORTHWESTERLY EXTREMITY OF THE COURSE DESCRIBED AS NORTH 26° 06' 16" WEST 273.72 FEET IN THE DEED OF A PARCEL OF LAND FROM MARBLEHEAD LAND COMPANY TO LISLE M. NIXON AND WIFE, RECORDED IN BOOK 19492 PAGE 307, OFFICIAL RECORDS OF SAID COUNTY; THENCE SOUTH 26° 06' 16" EAST 273.72 FEET ALONG THE EASTERLY LINE OF SAID NIXON PARCEL TO THE NORTHWESTERLY CORNER OF A PARCEL OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO MYLES A. COLLIGAN AND WIFE, FILED FOR RECORD JANUARY 11, 1945 AS DOCUMENT NO. 942, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 82° 59' 27" EAST 481.77 FEET ALONG THE NORTHERLY LINE OF SAID COLLIGAN PARCEL TO THE NORTHEASTERLY CORNER THEREOF SAID LAST MENTIONED POINT BEING AN ANGLE POINT ON SAID VOORHEIS PARCEL HERETOFORE DESCRIBED; THENCE NORTH 36° 57' 44" EAST 400.47 FEET ALONG THE NORTHWESTERLY LINE OF SAID VOORHEIS PARCEL TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION LYING WESTERLY OF A LINE THAT BEARS SOUTH 13° 29' 23" EAST WHICH PASSES THROUGH A POINT IN THE NORTHERLY LINE OF SAID LAND, THAT IS DISTANT THEREON NORTH 76° 30' 37" EAST 390 FEET FROM THE NORTHWESTERLY CORNER OF SAID LAND AND THROUGH A POINT IN THE SOUTHERLY LINE OF SAID LAND DISTANT NORTH 82° 59' 27" EAST THEREON 332.34 FEET FROM THE SOUTHWESTERLY CORNER OF SAID LAND.

ALSO EXCEPT THEREFROM ALL MINERALS, OIL, PETROLEUM, ASPHALTUM, GAS, COAL AND OTHER HYDROCARBON SUBSTANCES, IN, ON, WITHIN AND UNDER SAID LANDS AND EVERY PART THEREOF BUT WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED BY MARBLEHEAD LAND COMPANY IN DEED RECORDED MAY 24, 1945 AS INSTRUMENT NO. 867 IN BOOK 21974 PAGE 260, OFFICIAL RECORDS.

PARCEL 2:

AN EASEMENT FOR INGRESS AND EGRESS TO BE USED IN COMMON WITH OTHER OVER THAT PORTION OF SAID RANCHO TOPANGA MALIBU SEQUIT WITHIN A STRIP OF LAND 40 FEET IN WIDTH THE CENTERLINE THEREOF BEING DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF LOT 12, IN BLOCK 1 OF TRACT 12935, AS PER MAP RECORDED IN BOOK 248 PAGE 39 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTH 16° 51' 20" WEST 300 FEET TO THE NORTHWESTERLY CORNER OF SAID LOT 12; THENCE NORTHEASTERLY ALONG THE NORTHWESTERLY LINE OF SAID LOT 12, NORTH 41° 06' 58" EAST 369.55 FEET TO THE MOST NORTHERLY CORNER THEREOF; THENCE ALONG THE WESTERLY BOUNDARY OF THE DEED FROM MARBLEHEAD LAND COMPANY TO ROSS DAVID RAVEN ET UX., RECORDED NOVEMBER 12, 1943 AS INSTRUMENT NO. 902 IN BOOK 20336 PAGE 71, OFFICIAL RECORDS AS FOLLOWS:

NORTH 14° 42' 30" EAST 109.23 FEET; NORTH 6° 49' 00" EAST 172.32 FEET, NORTH 25° 31' 10" EAST 77.75 FEET TO THE NORTHWESTERLY CORNER OF THE LAND DESCRIBED IN DEED FROM MARBLEHEAD LAND COMPANY TO JOHN F. WAY, ET UX., RECORDED DECEMBER 4, 1943 AS INSTRUMENT NO. 744 IN BOOK 20483 PAGE 191, OFFICIAL RECORDS; THENCE ALONG THE NORTHWESTERLY AND NORTHERLY LINES OF LAST MENTIONED DEED AS FOLLOWS:

NORTH 25° 31' 10" EAST 69.36 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 106.68 FEET; THENCE NORTHEASTERLY 93.51 FEET ALONG THE ARC OF SAID CURVE; THENCE TANGENT NORTH 75° 44' 40" EAST 119.62 FEET TO THE NORTHWESTERLY CORNER OF THE LAND DESCRIBED IN THE DEED FROM MARBLEHEAD LAND COMPANY TO JULIUS H. YELLIN, ET UX., RECORDED MAY 22, 1944 AS INSTRUMENT NO. 423 IN BOOK 20907 PAGE 233, OFFICIAL RECORDS; THENCE ALONG THE NORTHWESTERLY BOUNDARY OF SAID DEED TO YELLIN AS FOLLOWS:

NORTH 60° 52' 50" EAST 167.65 FEET; NORTH 36° 21' 30" EAST 150.17 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY WITH A RADIUS OF 133.68 FEET; NORTHEASTERLY ON THE ARC OF SAID CURVE 95.59 FEET TO THE SOUTHERLY CORNER OF THE LAND DESCRIBED IN THE DEED FROM MARBLEHEAD LAND COMPANY TO SOPHUS HANSEN LUND, ET UX., RECORDED MAY 28, 1945 AS INSTRUMENT NO. 801 IN BOOK 22015 PAGE 182, OFFICIAL RECORDS.

PARCEL 3:

AN EASEMENT FOR INGRESS AND EGRESS TO BE USED IN COMMON WITH OTHER OVER THAT PORTION OF SAID RANCHO TOPANGA MALIBU SEQUIT WITHIN A STRIP OF LAND 30 FEET WIDE, THE CENTERLINE THEREOF BEING DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHERLY CORNER OF THE LAND DESCRIBED IN DEED FROM MARBLEHEAD LAND COMPANY TO THE SOPHUS HANSEN LUND, ET UX., RECORDED MAY 28, 1945 AS INSTRUMENT NO. 801 IN BOOK 22015 PAGE 182, OFFICIAL RECORDS; THENCE ALONG THE WESTERLY BOUNDARY OF THE LAND SO DESCRIBED NORTH 19° 58' 50" WEST 100 FEET; NORTH 2° 47' 35" WEST 100 FEET; THENCE NORTH 30° 04' 60" WEST 100 FEET; NORTH 48° 30' 35" WEST 155.98 FEET; NORTH 4° 42' 10" EAST 171.12 FEET; NORTH 11° 19' 50" WEST

158.20 FEET TO THE NORTHWESTERLY CORNER OF THE LAND DESCRIBED IN SAID DEED; THENCE ALONG THE WESTERLY BOUNDARY OF THE LAND DESCRIBED IN THE DEED FROM MARBLEHEAD LAND COMPANY TO HOPE M. PLENTY RECORDED DECEMBER 1, 1946 AS INSTRUMENT NO. 234 IN BOOK 23896 PAGE 409, OFFICIAL RECORDS AS FOLLOWS:

NORTH 17° 46' 30" WEST 112.63 FEET; THENCE NORTH 34° 24' 25" WEST 170.73 FEET TO THE SOUTHWESTERLY CORNER OF THE LAND DESCRIBED DEED FROM MARBLEHEAD LAND COMPANY TO LEO D. FLAIKOFF, RECORDED MARCH 4, 1947 AS INSTRUMENT N0.1085 IN BOOK 24308 PAGE 116, OFFICIAL RECORDS; THENCE ALONG THE WESTERLY BOUNDARY OF THE LAND DESCRIBED IN SAID DEED TO FLAIKOFF, AS FOLLOWS:

NORTH 46° 11' 30" WEST 158.62 FEET; NORTH 28° 07' 45" WEST 459.43 FEET; NORTH 39° 16' 15" WEST 252.74 FEET; NORTH 19° 33' 00" WEST 149.92 FEET, MORE OR LESS, TO A POINT IN THE SOUTHERLY BOUNDARY OF THE LAND DESCRIBED IN DEED FROM MARBLEHEAD LAND COMPANY TO HELEN C. DAWSON RECORDED AUGUST 3, 1945 AS INSTRUMENT NO. 603 IN BOOK 22177 PAGE 303, OFFICIAL RECORDS.

PARCEL 4:

AN EASEMENT FOR INGRESS AND EGRESS TO BE USED IN COMMON WITH OTHERS OVER THAT PORTION OF SAID RANCHO TOPANGA MALIBU SEQUIT WITHIN A STRIP OF LAND 30 FEET WIDE THE CENTERLINE THEREOF BEING DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY EXTREMITY OF THE CENTER IN COURSE IN THAT CERTAIN 20 FOOT EASEMENT DESCRIBED AS NORTH 28° 07' 45" WEST 459.43 FEET IN THE DEED FROM MARBLEHEAD LAND COMPANY TO HELEN C. DAWSON RECORDED AUGUST 3, 1945 AS INSTRUMENT NO. 603 IN BOOK 22177 PAGE 303, OFFICIAL RECORDS; THENCE NORTH 26° 55' 07" EAST 148.17 FEET; THENCE NORTH 13° 39' 14" EAST 218.75 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHERLY WITH A RADIUS OF 30 FEET; THENCE NORTHEASTERLY 52.86 FEET ALONG THE WIDE OF SAID CURVE; THENCE TANGENT SOUTH 65° 23' 03" EAST 49.55 FEET; THENCE SOUTH 82° 43' 06" EAST 59.41 FEET; THENCE NORTH 62° 04' 50" EAST 62.91 FEET; THENCE NORTH 44° 44' 00" EAST 51.34 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHERLY WITH A RADIUS OF 100 FEET; THENCE EASTERLY 82.00 FEET ALONG THE ARC OF SAID CURVE; THENCE TANGENT SOUTH 88° 16' 58" EAST 101.72 FEET; THENCE NORTH 67° 06' 00" EAST 68.50 FEET; THENCE NORTH 45° 06' 00" EAST 70.50 FEET; THENCE NORTH 21° 33' 00" EAST 74.31 FEET; THENCE NORTH 19° 59' 20" WEST 33.97 FEET; THENCE NORTH 3° 56' 00" EAST 48.31 FEET; THENCE NORTH 12° 49' 12" WEST 107.80 FEET; THENCE NORTH 56° 58' 25" WEST 69.73 FEET; THENCE SOUTH 85° 42' 15" WEST 86.33 FEET MORE OR LESS, TO A POINT IN THE SOUTHERLY BOUNDARY OF PARCEL 1, EXCEPT THE LAST SENTENCE SHOULD READ THENCE SOUTH 85° 42' 15" WEST 86.33 FEET MORE OR LESS TO A POINT IN THE SOUTHERLY BOUNDARY

OF THE LAND DESCRIBED IN THE DEED FROM MARBLEHEAD LAND COMPANY TO DUDLEY B. MURPHY, RECORDED AUGUST 28, 1946 AS INSTRUMENT NO. 1366 IN BOOK 23680 PAGE 1, OFFICIAL RECORDS.

# Exhibit B

## Overview of Funds Used for Down Payment on Malibu Real Property

|  | Amount | Percentage |
|---|---|---|
| RBC Dain Rauscher (see below) | $2,696,748 | 50.0% |
| WF Corp Trust (see below) | $1,173,820 | 21.8% |
| Unknown | $921,049 | 17.1% |
| Troy Gould | $539,888 | 10.0% |
| Interest Earned | $60,095 | 1.1% |
|  | $5,391,600 | 100.0% |

| WF Corp Trust Breakdown | |
|---|---|
| MicroMed | $853,820 |
| Cyberkinetics | $320,000 |
|  | $1,173,820 |

| RBC Dain Rauscher Breakdown | |
|---|---|
| MicroMed | $1,829,672 |
| Logistical Support | $625,000 |
| Unknown RBC accts | $242,076 |
|  | $2,696,748 |

28

Exhibit "B"

# Exhibit C

## Tracing of Funds Used for Down Payment on Malibu Real Property



Exhibit "C"

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Christina A. Snyder_____ and the assigned Magistrate Judge is _____Alka Sagar_____ .

The case number on all documents filed with the Court should read as follows:

## 2:13CV8686 CAS ASx

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____November 25, 2013_____
Date

By ___J.Prado_____
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] **Western Division**<br>312 N. Spring Street, G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Ste 1053<br>Santa Ana, CA 92701 | [ ] **Eastern Division**<br>3470 Twelfth Street, Room 134<br>Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| United States of America | One Real Property Located in Malibu, California |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |
|---|---|
| Katharine Schonbachler, Assistant United States Attorney<br>1400 United States Courthouse, 312 North Spring Street<br>Los Angeles, California 90012<br>Telephone: (213)894-6166 Fax: (213) 894-7177 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. §§ 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☒ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: **CV13-8636**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [X] Yes  [ ] No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [X] Los Angeles | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |

**C.1.** Is either of the following true? If so, check the one that applies:

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2.** Is either of the following true? If so, check the one that applies:

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

## CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☐ NO  ☒ YES

If yes, list case number(s):   CV 11-1637-GHK; CR Misc. No. 13-0183; and CR Misc. No. 13-2726

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _Katharine Schonbachler_    DATE: November 25, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |